are present, so we will proceed with the argument on our first calendar, on the calendar 21-955 Bonine, I'm not sure I'm pronouncing it correctly, versus Guccione, and counsel's names. Very good. Please proceed. Judge Carney, and may it please the Court, good morning. I'll reserve three minutes. Citrin was a critical acquisition for Aceto. It brought, according to the CEO of the company, growth from low single digits to upwards of 20% projected ex-ante from the time of the acquisition. What Aceto itself, as liquidating debtor in its bankruptcy, alleged in an adversary complaint was immediately, in December of 2016, upon executing a supply agreement, the sole and major supplier, called Oro Bindo, ceased supplying enough product for Aceto to meet its customers' needs. By the middle of 2017, Your Honors, I will just, for point of reference, inform that the fiscal year ends on June 30th. By the middle of calendar 2017, Oro Bindo had started to impose what Aceto describes as arbitrary volume caps. This subjects Aceto to failure to supply penalties. Beginning in August of 2017, when defendants disclosed in their 10-K the annual results for the year ended June 30th, 2017, there is no mention of Oro Bindo's failure to supply. There is no mention of arbitrary volume caps, and this is in the context of a risk disclosure specifically detailing that a supplier's failure to supply can have adverse effects on Aceto, its operations, and its financial results. So your view is they have to disclose the details of all that? That they have to say, as a general matter, supply chain stuff could affect share price? And by the way, we're having real problems with a particular vendor? Judge Sullivan, if the problems are material, as we know from Rambach, it is acceptable to warn, but if the risk has already transpired, the warning in and of itself is actionable, which we've pleaded in this complaint in which, by the way, Judge Sullivan. But what you're saying, and I think what Judge Corman was saying in response, what you're saying that they should have given chapter and verse, and Judge Corman basically said, well, a reasonable investor is not going to care about chapter and verse. If there's problems with supply chain, the particulars are not particularly salient. And that may be so in the normal course. This acquisition, however, Judge Sullivan, was exceptional. So if I can point you to a place in the record, the conference call one year before the November 27th conference call, the same day in 2016, and once again.  Yes. And they discussed the acquisition of the Citrin products, Judge Sullivan, in that conference. So in that conference, and I'll refer you to AA-108, AA-108, and in that conference, they say the following, the defendants say the following, API disruptions have caused back orders on two specific products during our first quarter and will carry over into the second quarter. We have plans in place to resolve this by the beginning of our fiscal third quarter. Judge Sullivan, that rings virtually identically to what they said in November of 2017. Now, in November of 2017, their single largest supplier now, Orobindo, which was very important to the many products, including, as they say, Resuvastatin, which was sort of a blockbuster generic, in 2017, they repeat that disclosure. I now point the court to what an analyst asks in the May 3rd conference call. The analyst said, wait a minute. You told us that Orobindo was a good manufacturer and was going to solve certain supply problems, right? Now you're telling us that because of Orobindo, you have incurred $10 million of failure to supply penalties. What's going on here? When did this occur? Now, the question when did this occur is easily answered. Immediately upon the execution of the supply agreement, Orobindo materially failed to supply. So, Judge Sullivan, Judge — first of all, Judge Corman was incorrect that they mentioned Orobindo prior to May. They did not. They did not mention Citrin Orobindo. Second — But did not mention them — I mean, everybody knew that they had acquired Citrin, right? Yes, they did. But in the context of the supply problems, and as Rhonda — I'm sorry, following up as well, I'm curious about what you're saying they exactly should have disclosed. What exactly should they have disclosed? Going along Judge Sullivan's line, I mean, there were generic disclosures about exposure to penalties that — and difficulties in supply chain, how dependent they were on supply, and so on. I'm sorry, you can't hear me? No, no, I can. I'm just listening carefully. I'm sorry, Judge. But I'm having difficulty understanding exactly what you believe they should have disclosed. And after you address that, maybe you can also address the CNTR question. Sure, sure. And this is part and parcel of the same thing. I don't think there's a question that the company and its offices and directors knew of Orobindo's failure to supply and of the arbitrary volume caps. I'll also say with respect to that point, Judge Cardi, that in May we find out that failure to supply penalties, they're billed in a particular quarter, but they occurred far before that, at least a quarter before that. So they were probably incurring those penalties at least in the 12-31-2017 quarter and probably earlier. So you're saying the failure to disclose their exposure to those penalties was actionable and they — and also as a basis for inferring that they were trying to deceive. Is that right? Yeah, absolutely. They had failed to supply their customers before the March 31, 2018 quarter. May I continue, Your Honor? Why don't you take another two minutes? Okay, that's great. Thank you so much. So you're asking me what they should have disclosed. As I said to Judge Sullivan, in the context of what they had disclosed over and again, and in the context of their saying that Orobindo as a single sole source supplier would help to alleviate those problems with respect to the Citrin products, they're required to say that what we just did, purchasing for $270 million, an enormous amount of debt for this company, what we did seems to be having a hiccup. Whether it's because of fraud or breach of contract or a fire in a factory, Judge Carney, Orobindo was not supplying, and because of its failure to supply, Aceto, rising, could not supply its customers. That is different in kind and context. There are two more things. If we look at the November disclosure, they say API constraints. There were no API constraints. There was no capacity problem, right? And if the API constraint they're referring to, Judge Carney, was a refusal or a failure to supply for any reason, that's material, and they have to add that to API constraint. They don't. They say, Judge Carney, that it's short term. This had been going on since the execution of the contract in December of 2016. For the entirety of that time, there were failures to supply, and there were arbitrary volume caps, right? And third, they say, Judge Carney, that specifically, precisely, just as they said in 2016, they say there are two products involved. What we know now is they knew that there were seven products involved, at least, and that's from the adversary complaint. So the disclosure is, first, completely fungible with prior disclosures in advance of the acquisition, and second, has none of the particulars. And the analysts are shocked in me, Judge Carney. They're shocked. They did not know that what they were describing in November, what they had failed to describe in August, what they were describing in November and February, the analysts did not know that it related to this brand new big acquisition. All right. Thank you, Mr. Goldberg. Thank you. We'll hear from counsel for Mr. Guccione and Al. Good morning, Your Honors. Before I start, I see my timer is five or six minutes. Yes. I was going to mention that. Thank you. Good morning. May it please the Court. Stan Shea for the appellants other than, or appellees, other than Doug Roth. Plaintiffs' Orr-Bindell problem theory of the case, as Judge Corman noted, suffers from four basic defects. One, he has not meaningfully grappled with the disclosures that Aceto actually made. Two, he has never submitted a contemporaneous document or any other contemporaneous source of information that would anchor the factual allegations or the conclusory allegations he's made in a second amended complaint. Third, and we went into this in some depth in our brief, he's mischaracterized the Orr-Bindell complaint in an effort to retroactively impose a duty that did not exist during a class period. That, as we've argued, is improper fraud by hindsight. And fourth, plaintiff hasn't grappled with, especially as it comes to the strong inference of Sienta that he has a burden to plead at this stage, the more cogent, more compelling, non-fraudulent inference, simply that Aceto was tricked by Orr-Bindell. That Aceto believed that the failures to supply that started in the first quarter of fiscal 2018 were fixable. And when my colleague here said they were short-term, Aceto explained the short-term meant, we expect that this would be resolved by the end of the fiscal year, a year from now. This was not something that would be resolved in a day or a week. But investors knew, as early as the first quarter of fiscal 2018, that these were problems. That Aceto, in its optimism, did not believe it would be resolved until the end of the fiscal year. Well, I guess there's two questions. One is, at what point did they know they were being duped? And two, at what point did they know that there were big problems, as opposed to short-term or fixable problems? Sure. I think, as it relates to being duped, what we know from the complaint is that the Orr-Bindell complaint was filed three months after the class period. They certainly knew they were being defamed. When you look at the allegations and the progression of the events, the central allegation that demonstrated Orr-Bindell's purported bad faith—this case was never decided, it was settled—was the refusal to supply in September of 2018. We're now in the first quarter of fiscal 2019 at this point. There's a refusal to supply by Orr-Bindell's subsidiary. Even then, Orr-Bindell's subsidiary said, go get it from Orr-Bindell. This was still in the context of business discussions, and it was sometime after that—the complaint doesn't say when—that Orr-Bindell said, stole a customer. And when you're looking at the disclosures that Aceto was making during this time frame, this first quarter, the fourth quarter of fiscal 2018, the first quarter of fiscal 2019, Aceto was saying more than just, oh, you know, we have failures to supply. It has disclosed the amount and magnitude of the failure to supply penalties. It has disclosed the causes of these failures to supply penalties, not just Orr-Bindell, unlike what plaintiffs said, but also Aceto's own supply chain problems, and also customers tightening the reins on failure to supply penalties. Still wasn't—I mean, Orr-Bindell later emerged to have its own motives and its own story going on, but given the magnitude of the acquisition of Citron and Lucida, I guess it is, and the heavy reliance, it appears, that the company was placing on Orr-Bindell, it seems surprising that Orr-Bindell isn't memed. It's just kind of covered in generic headwinds and problems in supply chain, and we're generally reliant on our suppliers. And, you know, why isn't—why wasn't that maybe reflective of a desire to kind of cover up this extraordinary vulnerability, or an extraordinary vulnerability, and a significant problem that could be expected to continue in the business? Sure, Your Honor, and I think there's sort of two parts—a two-part answer. First, by May 2018, as plaintiff concedes, the investors and analysts were aware that one of the problems was Orr-Bindell, and that was the same quarter that Aceto disclosed that the failure to supply penalties—not the failures themselves, but the penalties—had materialized. Plaintiff has never contested that timing of the failure to supply penalties, that they materialized in the third quarter of fiscal 2018. And in that same quarter, Orr-Bindell's potential involvement was disclosed. Prior to that, where you have failures to supply, but no penalties materializing, and you have Aceto's good faith belief that it could work this out, that this was an issue that would be resolved by the end of the fiscal year, we're not aware of any case law that would require Aceto to name and shame Orr-Bindell. And in fact, Your Honors, given Aceto's disclosure— Can I interrupt there? I'm sorry, but it seems to me that if you're touting them as reputable and reliable, when in fact they are, at the very least, really disappointing, and chronically so, isn't there a tension there? I think it depends on your definition of chronically, and I don't mean to be pedantic on this. You know, by the second quarter of fiscal 2018 is when you really see failures to supply begin. And this is a dispute that we've had with Plaintiff over his misreading of the Orr-Bindell complaint. This is the start. This was not the culmination of a year's worth of failures to supply, and we have not seen any contemporaneous document or allegation that establishes that fact that he keeps trying to establish. So if we view it from this angle, the fact that he has not— Plaintiff has not established a year's worth of failures to supply, but rather, this was the start of failures to supply, then it seems to me that naming and shaming Orr-Bindell would be counterproductive. It would hamper Aceto's efforts in trying to resolve, in good faith, as they believed at the time, the problems that they were dealing with. And it's only now, after the fact, after a further year plus of failures to supply, refusing to supply, stealing a customer, that we look back and say, that was the start of the problems. And we think Plaintiff has the burden to plead more. If he wants to establish that there were failures to supply starting from January of 2017, the day after the first supply agreement was entered into, eight months before the second supply agreement was entered into, it's his burden to plead facts, to establish that allegation, identify reports or statements containing those facts, and to show that our clients were aware of those facts, in order to establish a strong inference of scant return. Thank you very much. Thank you, Mr. Shea. We'll hear from Mr. Abel on behalf of Mr. Roth. Good morning, and may it please the Court. My name is Kenneth Abel, and I'm here today on behalf of Defendant Epeli Douglas Roth. I'd like to separately respond to some of the arguments that pertain exclusively to Mr. Roth. In his 60B motion, Plaintiff argued that insider trading charges against Mr. Roth and a non-party would allow him to cure deficiencies in his complaint. With respect to Mr. Roth, the threshold issued before the Court is a straightforward one. Did the District Court correctly find that Plaintiff lacks standing to assert such a claim? We respectfully submit that the District Court correctly held that Plaintiff does not have standing to assert that claim, for the simple reason that Plaintiff purchased shares in Aceto two months before Mr. Roth executed improper trades. And the chronology on this is clear, Your Honors. Mr. Roth engaged in insider trading when he executed trades on April 3rd and April 4th of 2018. Plaintiff purchased his shares on February 2nd and February 5th of 2018. Thus, it is undisputed that Plaintiff purchased his shares two months before Mr. Roth executed improper trades. And significantly, Your Honors, the record contains no evidence whatsoever of any other improper trades. Can you respond to Plaintiff's argument that, I'm not sure how this relates to standing, but the argument that the insider trading by Mr. Roth and the other individual provided a motive, essentially provides a motive such that the scienter analysis is somewhat, the standard is somewhat lowered in terms of what has to be established.  It's fair to infer that that is from the supply problems with the single biggest supplier of the single biggest product. And that provided an incentive to continue to withhold information about how bad the supply problems were to keep the stock price up to hide the fact that the insider trading was actually going on. Yeah, Judge Etkin, I think what Plaintiff tries to do on that front is to argue that there's this inextricable link between the issues with Orobindo and the MNPI or the material non-public information that Mr. Roth had when he executed his trades. The MNPI, which he pledged to and which is alleged in the information in the SEC complaint, was solely that he knew that the new CFO, Mr. Borkowski, was in the process of negotiating a waiver to the credit facility. That waiver, and it had happened in the past with amendments, was based on a host of factors, which are outlined in the briefs, that are unrelated to Orobindo. And in fact, none of the charging documents even mention Orobindo. There's never been an allegation put simply that Mr. Roth knew that undisclosed problems with Orobindo were what were causing the company to have its financial difficulties. And there were a bunch of other reasons why Mr. Roth and others within the company truthfully understood that the problems were stemming from other issues. But wasn't Mr. Roth the chief financial officer? And accordingly, wouldn't he be aware of the significant penalties that were being accrued and the, I mean, on an asset that they had spent millions, over $100 million to acquire? I mean, how could he not know? Yes, Judge Carney, just to be clear for the record, the charges didn't start to actually accrue and materialize until much later, after Mr. Roth was gone from the company. He knew that those were a possibility, I believe. Oh, I see. So the penalties were not, but he knew that they had to renegotiate the financial covenants. He did. And that was, according to him and to others, and it's in the briefs again, it was attributable to a bunch of different things that were going on with the company. Competition and the generic headwinds. It wasn't in his mind or anyone else's mind attributable to undisclosed problems with Orobindo. Of course, you say that, but the record is what we have. I mean, that's not established, is it? Well, Judge, and just to answer your question specifically, he notified the company that he was retiring in October of 2017. In early 2018, a new CFO had taken over, and he was largely marginalized at that point and wasn't kind of in the core decision-making group. The only thing that he ever pled to, Judge, was that he knew that they were negotiating a waiver to the credit facility, and that's it. All right. Thank you. You're welcome. Thank you. Okay. Mr. Goldberg, you have three minutes of rebuttal. Thank you, Your Honor. Let me work primacy first. Mr. Borkowski came on in February. Mr. Roth was gone in late March. Mr. Borkowski resigned as CFO after a month and a half, just before the company had to disclose that they were writing down all of the goodwill and all of the intangibles from the Citrin and Lucid acquisitions. That is very suspicious, number one. Number two, Mr. Roth, and this is we do not ask the Court to accept Mr. Roth's guilty plea. We are only saying that we may leverage the allegations and the information. The information, the United States government alleged that Mr. Roth caused others to trade in Aceto stock in January in advance of my client's purchase. As we stated in our brief, Judge Corman ignores that fact completely. That's the fact is the allegation. There's no fact that's been established, though. Isn't that correct? No, but I was going to get to that, Judge Carney. Thank you. My dear friend, Mr. Shea, keeps saying established, established, established. What we need to do, Judge Carney, is plead with requisite particularity. I am entitled to rely on what the United States government alleges, subject to my being able to prove it later for purposes of the Roth allegations. So when the United States says Mr. Roth caused others to execute trades based on MNPI in January, that standing issue evaporates. And again, I ask you to look at Judge Corman's March order. It's silent on the issue. Next, I want to talk about Judge Sullivan. You mentioned reliable. In November, Orobindo in the 10-Q is reliable. In February, in the 10-Q, Orobindo is reliable. In May, Judge Sullivan, in the 10-Q, Orobindo is reliable. Orobindo is not reliable. I'd like to refer to the— But reliable is often one of those subjective terms that is kind of — that often is not enough to get you a fraud claim in the 10-B action, right? So first, Judge Sullivan, I'll refer you to Rombach, which says subject to the current data. If the current data doesn't support that, I concede a subjective statement of reliability. If the current data is at odds with that, not just a little bit. They failed to supply 6 pills here and 10 pills there. But a systemic failure, they are not reliable as — as investors would understand it. I also refer the Court to the Textron case. If, Judge Sullivan, you're weighing two reasonable inferences, my dear friend, Mr. Shea, might say, hey, reliable doesn't mean that. And I might say, well, reliable does. If both are reasonable, Judge Sullivan, as Judge Lohier wrote over Judge Kaplan's dissent in Textron, I'm entitled to the inference, as long as it's reasonable with respect to anything but Sienta. So when we're talking about reliability, Judge Sullivan, I'm entitled to the reasonable inference that subject to the data, as this Court said in Rombach, there was a different situation. And my friend says to you, there is nothing in this complaint that establishes anything. Well, there is. Lowenstein-Sandler, the law firm that first represented the defendants in this case, filed the adversary proceeding in bankruptcy. It is, from my perspective, deliberately vague in the context of its trying to plead fraud. Where is anything about reliance? Where is any statement that Orobindo promised to supply? What the complaint shows, and again, Textron is determinative on this, what the adversary complaint shows is immediately there was a material failure to supply. And then by mid-2017 calendar, there were arbitrary caps. And I refer you last, because I'm over time, last to the May discussion about failure to supply penalties. Judge Carney, I think you hit the nail on the head when you said accrue. To accrue is when I, Acido, fail to supply. They may penalize me. What Mr. Connelly, Defendant Connelly, said in May is these lag. They refer to the past. Acido knew it didn't supply its customers no later than November when they said they're reliant. Thank you so much. Thank you very much, Mr. Gold. Thank you both. Well argued. We'll reserve decision. Thank you.